DETROIT TERMINAL RAILROAD CO. *v.* BUDD WHEEL CO.
SAME *v.* EDWARD G. BUDD MANUFACTURING CO.

1. Carriers—Construction of Tariffs—Usage by Parties.
    Actions of railroads and shippers cannot change published tariffs approved by State and Federal authorities, but long-continued construction, uniform and clear in its purport, accepted and acquiesced in by the interested parties, can be considered in determining construction of tariffs, if doubtful otherwise.

2. Same—Switching Charges—Construction of Tariffs—Public Service Commissions.
    Public regulatory commissions whose approval of switching charges is required ought not to be considered as bound by an obscure construction of tariffs not discovered by carrier until after 20 years' active operation under clauses in question.

3. Same—Switching Charges—Discrepancy with Other Rates—Construction of Tariffs.
    A great discrepancy between amount paid and accepted without question for a 20-year period for switching charges and amount claimed under recently-discovered construction of tariffs therefor in comparison to other scheduled rates will be considered in determining a doubtful interpretation of tariffs.

4. Same—Switching Movements—Carrier's Use of Own Trackage in Part—Intraplant Movements.
    Switching movements of railroad cars which begin and end on tracks owned and maintained by defendant in its plant and which involve traversing a total distance of from 2,000 to 3,000 feet *held,* intraplant movements rather than intraterminal movements under tariff provisions notwithstanding that in making such movements plaintiff carrier was required to make use of from 200 to 700 feet of one of its own tracks and that it would appear that in making up a tariff some extra compensation could go to plaintiff for use of its property.

Usage, see 1 Restatement, Contracts, §§ 245–249.

Appeal from Wayne; Richter (Theodore J.), J. Submitted April 4, 1945. (Docket Nos. 35, 36, Calendar Nos. 42,946, 42,947.) Decided June 4, 1945.

Separate actions of assumpsit by Detroit Terminal Railroad Company against Budd Wheel Company and Edward G. Budd Manufacturing Company, corporations, for switching charges. Cases consolidated. Judgment for defendants. Plaintiff appeals. Affirmed.

*John J. Danhof* and *Kenneth F. Stone* (*Russell T. Walker,* of counsel), for plaintiff.

*Lightner, Crawford, Sweeny, Dodd & Mayer,* for defendants.

Reid, J. These two cases, consolidated for the purpose of this appeal, were brought in assumpsit to recover for undercharges for switching services performed at defendants' plant, located at 12141 Charlevoix avenue, Detroit, during the period June 2, 1939 to April 7, 1942. From judgment in each case of no cause of action rendered May 17, 1944, the plaintiff appeals.

The dispute in this case is over the determination of what is intraplant switching and what is intraterminal switching, as set out in the published tariff. Determination of that question will also determine the proper charge under the published tariff for switch movements at defendants' plant. Schedules are set out in the bill of particulars in each case showing the cars switched, from what track and to what track, the amount paid, the legal charge claimed by plaintiff, and plaintiff's claim as the amount due in the case of each car.

Plaintiff claims the following as facts in the case:

"Plaintiff contends that the lawful charge for switching the cars involved in these suits was $13.20 per car prior to March 17, 1942, and $13.99 per car thereafter, this being the intraterminal switching charge provided in its published tariff No. 14 X for moving cars between industrial tracks. Defendants, on the other hand, contend that the railroad was paid in full when it received $3.30 for each car handled prior to March 17, 1942, and $3.50 for each car handled thereafter, this being the charge provided in the tariff for local movement within an industrial plant. Plaintiff's claim against the Budd Wheel Company amounts to $12,695.34 on 1,282 cars, and against the Edward G. Budd Manufacturing Company, $534.60 on 54 cars.

"Defendants' plant covers an area of about 40 acres and is located immediately to the east of the railroad's Mack yard. The tracks in Mack yard extend in a generally north-and-south direction. Three industrial lead tracks branch off the most easterly yard track into the plant. The southerly lead track is known as track No. 2 in the plant. The middle lead track divides in the plant into two tracks known as tracks Middle and No. 1, and the northerly lead track branches into five tracks in the plant designated as tracks 3, 4, 5, 6 and 7. Tracks 3 and 4 at the westerly edge of the plant extend in a generally north-and-south direction, while the remaining tracks extend in a generally east-and-west direction, and serve various locations for loading and unloading cars within the plant. The buildings are constructed so close to the westerly property line that the tracks could not be rearranged for switching from a single lead track.

"The easterly property line of plaintiff's yard and the westerly property line of defendants' plant are separated by an alley 33 feet in width known as Connors Lane. The industrial tracks into the

plant are owned by the railroad to the plant property line, and by the industry within the plant. The industry maintains the tracks on its own premises as well as those across Connors Lane.

"The defendants do not operate any railroad equipment themselves, all operations in the plant being performed by the plaintiff railroad.    *    *    *

"The performance of the switching service is admitted by the pleadings. Witness Daniel G. Cohan, general manager of the railroad, explained the various operating movements. It was necessary in each case to haul the car from a location on a track within the defendants' plant out onto a track known as Glory 2, the most easterly track in plaintiff's yard, and then push the car back into the plant to another location on another track.

"A recapitulation would show that about 80 per cent. of the cars were switched from track 2 to other tracks in the plant. Assuming there was no interference on the railroad yard track, an average movement from track No. 2 to tracks Middle and No. 1 would be about 2,000 feet, of which about 200 feet would be on track Glory 2 in plaintiff's yard. An average movement from track No. 2 to tracks 3 to 8, inclusive, would be about 3,000 feet, of which about 700 feet would be over track Glory 2 in plaintiff's yard. In each case part of the movement would be outside of the defendants' plant on railroad-owned tracks.

"The applicable tariff is Detroit Terminal Railroad Company tariff No. 14 X, filed with the Michigan public service commission as No. 83, and with the interstate commerce commission as No. 82. It was effective September 15, 1938.

"This tariff provides for a charge of $13.20 for switching cars between industrial tracks, and a charge of $3.30 for switching cars within the confines of any one industry or plant. The charges were increased to $13.99 and $3.50, respectively, by supplement effective March 17, 1942, which re-

flected a general increase in railroad charges throughout the country. The increase applies to six of the cars involved in the suit.

"It was conceded that plaintiff had billed the defendants at the lower charge during the three-year period prior to suit, and that charges were paid as billed. Witness Cohan, in response to defendants' inquiry, stated that the matter of assessing charges at the Budd plant came up for consideration in 1942, and that the management then determined that a former agent had been in error in assessing the lower charge."

Defendants concede that in the main such statement of facts is correct, but add and amend as follows:

"Each switching movement involved is a movement from one point within defendants' plant to another point within the same plant. Depending upon the location of the points within the plant to and from which the car is to be moved, certain switching operations require that the car be moved for a short distance over plaintiff's yard track, known as Glory 2, whereas other of the switching operations require no movement over plaintiff's yard track but do require, because of limited clearances, that some part of the car or locomotive touch or cross the defendants' property line.

"In those cases in which plaintiff's yard track (Glory 2) is not used the switching operations are carried out in their entirety on tracks which are owned by defendants to their property line and which were built and are maintained by the defendants across Connors Lane.

"It is plaintiff's contention that any switching movement which requires that any part of the locomotive or car cross the line marking the boundary between Connors Lane and the defendants' plant

is an 'intraterminal' movement under its tariff definitions.''

Such in general are the facts in the case. The declaration charges certain cars were moved as intraplant switching and others as intraterminal switching, and schedules are included in the record as part of the pleadings, setting forth which cars were moved through each of said movements. Local and joint freight tariff covering switching charges, special engine service and weighing of cars on the Detroit Terminal Railroad Company, issued August 5, 1938, and effective September 15, 1938, was received in evidence. The dispute is over the construction to be given two definitions in said tariff, under rule 11, which definitions are as follows:

''Intraplant switching is a switching movement from one track to another, or between two locations on the same track, within the same (single) plant or industry.''

''Intraterminal switching is a switching movement (other than intraplant) switching of traffic from one track to another of the Detroit Terminal Railroad.''

If we construe these two definitions in accordance with plaintiff's claim, judgment should be rendered for plaintiff for the amount claimed by it; if we adopt defendants' construction, the judgment appealed from should be affirmed.

The rate provided in said tariff for the so-called intraplant switching operation is $3.30 per car until March 17, 1942, and $3.50 thereafter, and for intraterminal switching, $13.20 per car until March 17,

1942, and after that date, $13.99 per car. The tariff further provides as follows:

| "Intra-terminal switching charges | Loaded cars, except as otherwise specifically provided for: | |
|---|---|---|
| | Between industrial tracks.. | $13.20 |
| | Between industrial tracks and team tracks......... | 14.30 |
| | Between industrial tracks and aviation tracks of Ford Motor Co........... | 14.30 |
| | Between team tracks...... | 14.30 |
| | Between team tracks and industrial tracks........ | 14.30 |
| | Between team tracks and aviation tracks of ·Ford Motor Co............... | 15.40" |

Further recited in the tariff under the heading, "local movement within industrial plants," appears the·following:

"Cars or locomotive cranes on their own wheels, switched within the confines of any one industry or plant by the Detroit Terminal Railroad, will be subject to a charge of $3.30 per car, except on cars or locomotive cranes switched between the Ford Motor Company and the aviation tracks of the Ford Motor Company charges will be $4.40 per car for each movement, loaded or empty."

The Detroit Terminal Railroad Company wrote and published this tariff, containing the definitions above quoted, with approval of State and Federal authorities. A sketch showing the tracks of the plaintiff and defendants which are involved in these cases was received in evidence and is appended to the record.

Defendants claim that any ambiguities in the language employed in the tariff, which tariff was

drafted by plaintiff, should be resolved in favor of the other party, namely, the defendants, and further claim that a long-continued and uniform course of conduct of the parties has indicated an acceptance of construction to be placed upon doubtful language. This course of conduct was acquiesced in by plaintiff and defendants and apparently as well by the public, which is represented by the Federal and State regulatory commissions, neither of which commissions seems to have taken any action whatever to enforce the interpretation of the tariff claimed by plaintiff.

The actions of the parties cannot change the tariff, but long-continued construction, uniform and clear in its purport, accepted and acquiesced in by the interested parties, can be considered in determining construction, if doubtful otherwise. See *Newton* v. *Bennett,* 111 S. C. 1 (96 S. E. 620); 25 C. J. S. p. 110; *Louisville Water Co.* v. *Louisville H. & S. L. Railway Co.,* 270 Ky. 833 (110 S. W. [2d] 668).

The construction claimed by plaintiff is so obscure that neither the plaintiff, which drafted the clauses in question, nor its various officers and attorneys, ever discovered it until after 20 years' active operation under the clauses in question, by which failure to discover the construction now contended for, the plaintiff must have lost great sums of money. The public regulatory commissions, whose approval is required, ought not to be considered by us to be bound by such an obscure construction.

The discrepancy between the amount which the parties have paid and accepted without question for a period of 20 years and the amount now claimed by plaintiff is so great in comparison to other scheduled rates that it cannot be entirely over-

looked in determining a doubtful interpretation of the tariff. The switching charge provided in the tariff to be paid for movement of cars for the Ford Motor Company, involving as it does the use of the tracks of another railroad and much longer switching operation, is limited to $4.40 per car. The provision for that operation makes the rate claimed by plaintiff for switching defendants' car seem out of proportion.

The switching movements for which extra sums are now claimed by plaintiff are considered by us to fall within the classification of intraplant movements. We have in mind that in making these movements the plaintiff company was required to make use of its own trackage to some extent at least, and that there could well be considered in making up a tariff some extra compensation to the Detroit Terminal Railroad Company for use of its property, but the test for intraplant switching is that the movement begins and ends in the plant of the same company, considered therefore as one industry.

In each case the judgment for the defendant is affirmed, with costs to defendant.

STARR, C. J., and NORTH, WIEST, BUTZEL, BUSHNELL, SHARPE, and BOYLES, JJ., concurred.